STATE OF VERMONT

ENVIRONMENTAL COURT

In re: Appeal of }
Thomas J. Baribault, James F. Carroll, Sr. }    Docket No. 165-9-98 Vtec
and Vincent Mulac, Jr. }
(formerly Jericho Center Citizens }
for Responsible Growth) }

Decision and Order

Mr. James F. Carroll, Sr., as a representative of a group called Jericho Center Citizens for Responsible Growth, and Appellant Thomas J. Baribault, appealed from a decision of the Planning Commission of the Town of Jericho approving a two-lot subdivision and amending a 1996 approval of an adjacent two-lot subdivision. After determining that the undefined group "Jericho Center Citizens for Responsible Growth" did not have party status under 24 V.S.A. §4464(b), the Court allowed Mr. Carroll and Mr. Vincent Mulac, Jr. to enter their appearances also as Appellants in this matter. Mr. Baribault, Mr. Carroll and Mr. Mulac appeared and represented themselves. Appellee-Applicants Albert and Myrna Lindholm are represented by Christina Pingert, Esq.; Interested Persons Terence and Andrea Hook entered an appearance in support of Appellee-Applicants and represented themselves. The Town did not enter an appearance in this matter.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows.

We note that this appeal involves only the approval of the final plat for the subdivision of this property, under the Subdivision Regulations of the Town of Jericho, and not either site plan approval under §601 of the Zoning Regulations or approval of a zoning permit for either of the lots under §703 of the Zoning Regulations, nor appeal of any access

1

permit for driveway access onto Browns Trace Road nor any state approval under the state subdivision or wetlands regulations.

This appeal involves property fronting on Browns Trace Road in the Town of Jericho. A great deal of confusion has been imported into this case due to the shifting boundaries and shifting lot numbering of the four parcels of property which must be referred to in this decision.

Browns Trace Road runs in a roughly north-south direction in front of the relevant parcels. Appellee-Applicants own property on both sides of the road, as do the Hooks. Their property on the easterly side of Browns Trace Road is not at issue in this case. Mr. Baribault's property and Mr. Carroll's property, while close enough to qualify them as parties under 24 V.S.A. §4464(b), is also located on the easterly side of the road and is not at issue in the present case.

The present case involves the history and the present relationship among what are now four adjacent parcels all with frontage on the westerly side of Browns Trace Road. For the purposes of ease of reference in this decision, the Court will refer to them as follows. The most northerly of the four lots, now owned by Mr. Mulac, is a 4.35-acre lot with an existing house located near the road and near its southerly boundary with the adjacent lot. We will refer to this lot as "the Mulac lot."

The next parcel to the south, adjacent to the southerly boundary of the Mulac lot, is an undeveloped lot proposed for a boundary adjustment and for approval of the subdivision in the present application. Just prior to this application, the lot contained 3.06 acres. The boundary adjustment proposes adding land to this lot from the next parcel to the south, resulting in an area for this lot of 3.89 acres. We will refer to this lot as "the northerly Lindholm lot."

The next parcel to the south, adjacent to the northerly boundary of the Hook lot, is an undeveloped lot proposed for a boundary adjustment and for amendment of a previous subdivision involving that lot.[1] A farm road exists extending from Browns Trace Road onto

---

[1] Although a related state subdivision permit EC-4-0658-3 approved the construction of one four-bedroom, single-family residence on each of the northerly and the southerly Lindholm lots, that permit nevertheless only approves locations and plans

2

this parcel. The Hooks testified regarding their intent to purchase this parcel and to use it for agricultural and scenic view purposes. Just prior to this application, the lot contained 5.15 acres. The boundary adjustment proposes subtracting land from the rear portion of this lot to be added to the next parcel to the north, resulting in an area for this lot of 4.32 acres. We will refer to this lot as "the southerly Lindholm lot."

The most southerly of the four lots, now owned by the Hooks, is a 3.02-acre parcel containing a barn located near the road. We will refer to this lot as "the Hook lot." The Hooks also own property across the road including their dwelling, an historic house located close to the roadway.

Sequence of Property Divisions and Subdivision Approvals

The 7.45-acre parcel of land consisting of what is now the Mulac lot and the 3.06-acre northerly Lindholm lot was formerly owned by Lawrence and Susan Brown, who acquired it in 1964. The Lindholms acquired the land consisting of what is now the Hook lot and the 5.15-acre southerly Lindholm lot in 1968. Mr. Mulac has owned his parcel since at least 1988, when a septic permit was issued for it.

---

for a drilled well and a sewage system on the northerly Lindholm lot.

In 1978, the Lindholms acquired the 3.06-acre[2] northerly Lindholm lot from the Browns, by what they term in their memorandum a "boundary adjustment," although at the time they did not treat that lot as having become merged with their adjacent land. The question of whether the sale of this lot to the Lindholms should instead have been treated as a subdivision under town regulations in effect in 1978 is beyond the scope of the present case, as it was not appealed at the time and became final. 24 V.S.A. §4472. At least through 1996, the Lindholms appear to have treated the land they acquired by this transaction as a 3.06-acre lot separate from the approximately 8.17 acre parcel of adjacent land they had acquired in 1968.

In July of 1996, the Lindholms received Planning Commission approval of a "proposed 2-lot subdivision located on an 8+ acre parcel." A survey for that subdivision is referred to in Note 5 on Appellee-Applicant's Exhibit M as having been prepared on July 24, 1996, but it was not presented in evidence. A reduced-size copy of it was attached to Appellee-Applicants' "Request to Find and Memorandum," but even without using that document we can find from the evidence that the 8+ acre parcel which was the subject of this approval was the parcel consisting of the southerly Lindholm lot and the Hook lot (8.17 acres), and that it resulted in the subdivision of that parcel into the 5.15-acre southerly Lindholm lot and the 3.02-acre Hook lot, sold to the Hooks in or about September of 1996 .

The 3.06-acre parcel acquired from the Browns was not made part of the 1996 application. It may have been treated by the Lindholms or by the Planning Commission as having already been in existence as a separate lot. Regardless of the reasons for its omission, the question of whether the former Brown lot (now the northerly Lindholm lot) should have been included in the 1996 application (that is, whether the 1996 application should have been for an 11+ acre parcel rather than an 8+ acre parcel) is beyond the scope of the present case, as it was not appealed at the time and became final. Levy v. Town of St. Albans Zoning Board of Adjustment, 152 Vt. 139 (1989).

---

[2] Shown on Appellants' Exhibit 2 as a 3.10-acre lot. Under the state subdivision regulations that lot was transferred to the Lindholms with a "Deferral of Permit," transferring to the Lindholms the responsibility for obtaining a state permit for any future development on the lot requiring water supply or wastewater disposal.

4

Condition 4 of the 1996 subdivision approval required Planning Commission review and approval of "any substantial revisions to these approved plans."

The present application was filed in 1998 for approval of another[3] 2-lot minor subdivision, and was warned as "a proposed 2-lot subdivision of an 8+ acre parcel" and as an "amendment to the 7/16/96 Planning Commission approval of an adjacent 2-lot subdivision." The present application requested approval of a subdivision or change in the boundary between the northerly Lindholm lot and the southerly Lindholm lot, to provide additional land on the northerly Lindholm lot on which to locate a septic system. It requested approval of an amendment to the 1996 approval because the acreage of the southerly Lindholm lot involved in the 1996 approval would be reduced from 5.15 acres to 4.32 acres.

The Application before the Court

Appellants raised nine questions in their initial statement of questions and ten headings in their post-trial memorandum. They argue that the application should be denied on several grounds, or that conditions should be imposed.

Browns Trace Road in front of the northerly Lindholm lot is at an elevation of approximately 708 feet. The land slopes downward onto the lot from the road to an elevation of approximately 698 feet at the probable end of the driveway on the lot. The slope does not exceed 10% in the first 20 feet from the road. At the intersection of the driveway with the road, the sight distance is over 500 feet to the north and 400 feet to the

---

[3] The fact that the number of lots and approximate acreage was the same, but pertained to a different parcel of land, has added to the potential for confusion at several stages of this case. The 1996 application pertained to 8+ acres consisting of the 5.15-acre southerly Lindholm lot and the 3.02-acre Hook lot, while the 1998 application pertained to 8+ acres consisting of the 5.15-acre southerly Lindholm lot and the 3.06-acre northerly Lindholm lot.

5

south. These sight distances in both directions exceed the state minimum requirements for this road at the posted speed limit of 35 miles per hour. Drivers do frequently exceed the speed limit on this road, and serious accidents have occurred nearby.

At the intersection of the driveway with Browns Trace Road, Appellee-Applicant proposed to build up the land with large concrete blocks, to covered by compacted earth, to provide a foundation for the access from the road onto the driveway. This proposed design was approved in a Road Access Permit granted by the Town on March 20, 1997, and has been at least partially built. The Road Access Permit was not appealed and is not at issue before this Court. Appellants appear to argue that Appellee-Applicants should not have begun this work until they received approval of the subdivision application now before the Court, and that the access as built violates the Agency of Transportation B-71 driveway standards referred to in the Road Access Permit. No notice of violation or enforcement action under the zoning or subdivision regulations is now before the Court. If Appellee-Applicants wished to begin to build the driveway access authorized by their Road Access Permit, they did so at their own risk that some aspect of that design might also be subject to further conditions in the subdivision approval, or that the subdivision permit might be denied.

Appellants also argue in their post-trial memorandum that the construction to date has violated the state subdivision permit EC-4-0658-3. Any enforcement of the state subdivision permit is not before the court as it has not been brought by the state in an enforcement order or other enforcement action. In the present case, this Court only has before it an appeal of the Planning Commission's approval of the subdivision.

With respect to Question 1 of the Statement of Questions, Appellants argue that the application should have been referred to the then-ZBA (now the Development Review Board) instead of the Planning Commission under §203.4 of the Zoning Regulations. However §203 only refers to the interpretation of the boundaries of any district during an application for a zoning permit. That is, if the zoning administrator cannot determine which district a property lies in, and therefore cannot determine the requirements applicable to a project, under §203.4 the zoning administrator must refer the application for a zoning

6

permit to the ZBA. First, this provision does not apply to an application for subdivision approval, which is assigned to the Planning Commission and not the Zoning Administrator. (If any zoning permit application has been acted on in connection with the present application, regarding the proposed house construction, it has not or has not yet been appealed to this court). Second, §203.4 applies only to the Zoning Administrator's inability to determine the zoning district in which the project lies, and no party has suggested that any such uncertainty exists in the present case.

Question 4 of the Statement of Questions, addressing the relevance of the Planning Commission's findings in an earlier decision regarding this property, was eliminated from this case at the hearing.

Questions 2, 3 and 5 of the Statement of Questions address whether the northerly Lindholm lot ever underwent proper subdivision approval when it was separated from the Mulac lot, and whether the northerly Lindholm lot, the southerly Lindholm lot, and the Hook lot should have been considered to have been merged at that time, so that the 1996 permit proceedings should have considered all 11+ acres then owned by the Lindholms. As discussed above, regardless of whether those prior divisions of land were properly done under the zoning or subdivision regulations applicable at the time, the correctness of those prior actions is beyond the scope of the present case, as they were not appealed at the time they occurred, and therefore became final. Levy v. Town of St. Albans Zoning Board of Adjustment, 152 Vt. 139 (1989). Moreover, even if they had been challenged at the time, nothing in the Jericho regulations requires the merger of adjacent lots, especially as none of the three lots is undersized for the district. In re Appeal of Weeks, 167 Vt. 551(1998).

Questions 6 and 7 of the Statement of Questions address whether the application was properly treated as a minor subdivision and whether the application was complete.

The proposal before the court qualifies as a "minor subdivision" under the regulations, even if Appellee-Applicants have divided more than four lots over their period

7

of ownership[4] of land in Jericho, because the application now before the Court contains fewer than five lots and does not require a new public street. Subdivision Regulations, Article I, §(3)(21)(b). As a minor subdivision, it properly proceeded directly to Final Plat review. Article II,§(2).

Exhibits K, L and M before the Court contain all of the information required to be submitted by Checklist III in Article II,§(2). No waivers were requested. Checklist III(2)(e); Article V,§1.

Questions 8 of the Statement of Questions addresses whether the subdivision meets the standards for approval.

Appellants argue that the proposed subdivision fails to meet the purpose requirements of Article I, §2 of the Subdivision Regulations. However, these are hortatory, not regulatory provisions. That is, the Planning Commission is directed to consider these purposes when administering the Subdivision Regulations, but these purposes are not mandatory. They provide a guide or context to the administration of the regulations, but they are not independently enforceable just as the provisions of a municipal plan are not independently enforceable. Kalakowski v. John A. Russell, 137 Vt. 219, 225-26 (1979).

We next must examine whether the proposed subdivision, consisting of the northerly Lindholm lot and the southerly Lindholm lot, meets the applicable Development Requirements and Design Standards of Article III of the Subdivision Regulations.

§1: Lot Layout

---

[4] Unlike in Act 250, the Jericho regulations do not define a time period within which all sales of lots are included.

8

§1.1: Each of the two lots has the minimum area (3 acres) and minimum lot frontage (200 feet) required in the Rural Residential zoning district. Appellants question whether the northerly Lindholm lot contains the minimum contiguous developable area of buildable land required by §302.2 of the Zoning Regulations. Buildable land consists of all land exclusive of the River District, the Wetlands[5] Overlay Districts, the Wellhead Protection Area I, and all Natural Resources Overlay Districts, none of which is applicable to these two parcels. Exhibit K shows the building envelope as set back 50' from the parcel boundaries. By use of the plat scale, the Court finds that the northerly Lindholm lot contains well in excess of the required 10,000 square foot envelope of buildable land.

§1.2: No modification of the regulations is requested; this subsection is inapplicable.

§1.3: This section requires that lots be of sufficient size to provide an adequate building site with suitable areas and adequate isolation distances[6] for sewage disposal and water supply, both on site and from neighboring properties.

The proposed septic system is located at more than an adequate isolation distance from the Mulac property boundary, and even more from the Mulac shallow well. An intermittent stream runs in a bed running through the adjacent northerly Lindholm lot. The elevation of the stream bed is 645 to 646 feet above sea level. The Mulac lot is served by a shallow well located some 600 feet towards the rear of the Mulac lot, and approximately

---

[5] We note that the definition of buildable land refers to the overlay districts adopted in the zoning ordinance, and not to whether any portion of the lot meets the state definitions for designation as a wetland if it has not been adopted in an overlay district. That is, it is possible that the land may meet a state wetlands definition and require a state conditional use determination under the state wetlands regulations, even though it is not mapped into a town wetland district.

[6]Also see discussion of isolation distances at §§3 and 5 below.

120 feet from the intermittent stream at its closest point. The shallow well is located in a seep area on a hillside at an elevation of approximately 654 feet, with its bottom elevation at 649.9 feet above sea level, approximately three to four feet above that of the stream bed. The general area of the Mulac shallow well is wet even at dry times of the year. The area proposed for the leach field on the northerly Lindholm lot is located approximately 250 from the Mulac shallow well, and on the other side of the stream bed, but at a higher elevation of from 670.5 to 673 feet above sea level. Based on the evidence of Appellee-Applicant's soils scientist, there is no connection from the proposed septic system to the Mulac well; that is, a failure of the system would become apparent in the stream bed rather than rising sufficiently to contaminate the Mulac well.

The location of the proposed well on the northerly Lindholm lot, however, may be more of a concern regarding the Mulac septic system and replacement area. The Mulac lot is served by a septic system approved by the Town in July of 1988. It is located close to the rear of the Mulac house, but its exact location has not been placed on any plan or survey. Appellee-Applicant's Exhibit K only shows a "possible drilled well location." In order to approve the subdivision, Article III, §1.3 requires the Court to find that a well providing an adequate water supply is able to be drilled in a location on the northerly Lindholm lot which would not only meet all "applicable" requirements of the state water supply rules as proposed on Exhibits K and U, but which would also provide an adequate isolation distance between it and the road, the property boundaries, the stream bed, the proposed septic system and pressure line, and the Mulac lot's existing and replacement area septic fields, without compromising Mr. Mulac's ability to locate a replacement septic field should his current septic system fail. Because the Court cannot so find from the evidence presented by the Appellee-Applicant, the siting of the well must be required as a condition precedent to the subdivision approval.

§1.4: No lots are more than double the minimum area; this subsection is inapplicable.

§1.5: No corner lots are proposed; this subsection is inapplicable.

§1.6: Each lot is provided with satisfactory access to Browns Trace Road. The southerly Lindholm lot already has a farm road access, which neither Appellee-Applicants nor the Hooks propose to alter. Appellants request that the access for the northerly Lindholm lot

be over the farm road, which would require a shared driveway easement encumbering the southerly Lindholm lot. The Hooks, prospective purchasers of the northerly Lindholm lot, object to this proposal largely for reasons of the aesthetics and historic preservation of their farmstead, which is located on both sides of the road at that location. Appellants argue that the shared access is necessary because proposed access to the northerly Lindholm lot is unsafe due to vehicles' exceeding the speed limit on Browns Trace Road. However, the access to the northerly Lindholm lot has well in excess of the required sight distances at the posted speed limit, meets the requirements of §502 of the Zoning Regulations, and has received a Road Access Permit from the Town, the terms of which are not at issue in this appeal. A landowner cannot be further restricted based on the behavior of drivers who exceed the speed limit, or based on a town's failure to enforce the speed limit, unless those further restrictions are found in the zoning regulations or ordinance.

The driveway grades as proposed do not exceed 10% within twenty feet of the right-of-way for either lot, although the driveway grade for the northerly Lindholm lot is at or close to that limit. However, the access must be completed as designed and approved in the Road access permit, so that the concrete blocks are completely covered and the earth is compacted and tapers down on all sides from the level of the driveway to the surrounding ground, at sufficiently gentle grade so that it will not pose a danger to traffic on Browns Trace Road or to users of the driveway, including emergency vehicles.

§1.7: Lot drainage will not be significantly altered; drainage from the northerly Lindholm lot is towards the stream bed located on that lot, and not onto any other lot.

§1.8: No privately-owned reserved strip is proposed; this subsection is inapplicable.

§1.9: Both lots already front on Browns Trace Road. It is not feasible by changing the lot layout to avoid access from each lot to Browns Trace Road.

§1.10: Lot corners along Browns Trace Road are marked by concrete monuments.


§2: Streets and Pedestrian Access

No streets are proposed; as to streets, this section is inapplicable. No "blocks" are created more than 600 feet in length; therefore, as to pedestrian easements, §2.11 is inapplicable. Appellants argue that pedestrian easements should be provided along Browns Trace Road

11

because the total frontage of all the prior subdivisions exceeds 600 feet. As previously discussed, the prior subdivisions are not before this Court, but even if the total road frontage were to have exceeded 600 feet, §2.11 only applies by its terms where "blocks" are created in a subdivision and no "blocks" of any length are created by this subdivision.

§3: Provision of Water Supply

No public or community water system is proposed. An individual drilled well water supply water system is proposed for the northerly Lindholm lot only, to meet the state water supply rules as required by the state subdivision permit for this property, Exhibit U. Article III, §3.3 of the Subdivision Regulations requires, for an individual well, that "evidence of the location and availability of potable water in adequate quantities be provided." While a possible location for the well has been sited on Exhibit K, evidence of the availability of potable water in adequate quantities at that location has not been provided. Because such evidence has not been provided by the Appellee-Applicant, the siting of the well must be required as a condition precedent to the subdivision approval.

§4: Fire Protection

The location of the proposed house site is sufficiently close to the road to allow vehicular access from both directions on Browns Trace Road. No streets or public or community water systems are proposed for this subdivision, making the remainder of the considerations in this section inapplicable. The proposed driveway shall be reviewed by the Fire Chief to assure that it is of adequate width and that its design is adequate to allow access by fire trucks and other emergency vehicle even in the winter.

§5: Sewage Disposal

Article III, §5 of the Subdivision Regulations only requires that soils tests be completed for each lot, as required by the Jericho Health Ordinance and the State of Vermont Environmental Protection Rules. Approval of septic system designs for individual lots may be postponed to approval by the town health officer prior to the issuance of building permits for the individual lot. Soils testing has been done on both lots sufficient for

approval of the subdivisions. The proposed location of the septic field, to be served by a force main from the septic tank, has been approved by the state under the Environmental Protection Rules. Concerns regarding the location of that field with regard to the Mulac shallow well has been addressed in §1.3, above.

§6: Water Courses, Storm Drainage, Erosion Control, Excavation and Grading

Sufficient erosion control measures are proposed for the site work necessary to lay the force main under the stream bed, as required by Exhibit K and the state subdivision permit. No other aspects of this section are implicated by the proposed subdivision.

§7: Landscaping

Appellants do not argue that new trees or other landscaping should be planted along Browns Trace Road on either lot, beyond the vegetation already present on those lots.

§8: Utilities and Outdoor Lighting

Utilities are proposed to be placed underground as required by §8(1). No outdoor lighting is proposed; §§8(2) and (3) are inapplicable.

§9: Energy Conservation

The location of the building envelope on the northerly Lindholm lot allows the conservation of energy and permits the utilization of renewable energy resources.

§10: Recreation and Schools

No park, playground or school site is required; this section is inapplicable.

§11: Legal Documents

No homeowners' or condominium association is proposed; this section is inapplicable.

Appellants also argue that if approval of the subdivision plat is granted, that approval should contain detailed requirements to ensure the development of the lots will meet and

will continue to meet the subdivision regulation standards. Article IV, §1 of the Subdivision Regulations already requires improvements to be designed and installed in accordance with the design standards of Article III and other Town Regulations (such as the zoning regulations and road access standards). That provision is enforceable by Article VI, §3.

Question 9 of the Statement of Questions requests that the Court impose easements, protection and buffer areas for the benefit of the community. Similarly, in their post-trial memorandum, Appellants request denial of the application, or if it is to be granted, that the Court protect and preserve the wetlands and the wildlife corridor represented by the northerly Lindholm lot.

Even though the proposed subdivision does not appear within the Wetlands Overlay District as mapped by the Town, Appellants provided evidence that the rectangular flat area at the bottom or western end of the northerly Lindholm lot is adjacent to a Class II wetland, and that portions of the lot qualify by their vegetation and other characteristics to be classified as at least a Class III wetland or possibly as a Class II wetland or within the buffer area of the Class II wetland.

However, nothing in the Jericho subdivision regulations requires or even allows the Court to deny or condition subdivision approval on the presence of wetlands other than as shown on the Wetlands Overlay District. If the northerly Lindholm lot contains Class II Wetlands, a buffer area for Class II Wetlands, or Class III Wetlands, as those terms are defined by the state Wetlands Regulations, then any construction on the lot may require a prior Conditional Use Determination from the state. Appellants may be entitled to request from the Agency of Natural Resources some ruling on whether the property implicates wetlands under the state program. Such a determination is beyond the scope of the Jericho subdivision regulations and hence is beyond this Court's jurisdiction in this appeal.

Similarly, deer and other wildlife use the proposed subdivision property, especially following the stream bed. The Town has mapped wildlife corridors on larger parcels of property, but the proposed subdivision fell below the parcel size of 25 acres chosen for mapping. As of the last date of trial, the mapped wildlife corridors have not been

14

incorporated in the zoning or subdivision regulations. The available undeveloped land within Jericho for wildlife to travel is being reduced over time by development. However, Appellants have not shown that this subdivision, or the erection of a house on the buildable area of the northerly Lindholm lot, will prevent wildlife access to or use of the undeveloped areas on either parcel, or wildlife passage through those lots to other areas of the town. Further, as in the discussion of wetlands, nothing in the Jericho subdivision regulations requires or even allows the Court to deny or condition subdivision approval on the presence of a "wildlife corridor."

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the subdivision shown on Exhibits K, L, M and U is approved, subject to Appellee-Applicants' successful installation of a drilled well on the parcel in compliance with all state standards and isolation distances for the isolation of that well from the road, the property boundaries, the stream bed, the proposed septic system and pressure line, and from both the existing and replacement septic fields for the Mulac lot, and subject to the following conditions:

1. The subdivision improvements shall be completed as shown on the approved plans, and in compliance with any state permits, including Exhibit U, unless modified by the Planning Commission, Zoning Board of Adjustment or Development Review Board in a subsequent permit or permit amendment.

2. Utilities shall be placed underground as required by §8(1).

3. The proposed driveway access to the northerly Lindholm lot shall be reviewed by the Fire Chief to assure that it is of adequate width to allow access by fire trucks to the house site even in the winter, and that the slope of the compacted earth from the driveway to the surrounding ground level will not pose a hazard to emergency vehicles or prevent them from achieving emergency access to the house site.

4. The driveway access to the northerly Lindholm lot shall be completed as designed and approved in the Road Access permit, so that the concrete blocks are completely covered and the earth is compacted and tapers down on all sides from the level of the driveway to the surrounding ground, at sufficiently gentle grade so that it will not pose a danger to traffic on Browns Trace Road or to users of the driveway, including emergency

15

vehicles.

Dated at Barre, Vermont, this 29th day of May, 2000.

_____
Merideth Wright
Environmental Judge